```
1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3      THE UNITED STATES OF AMERICA,)
                                    )      File No:  CR-11-151
4                    Plaintiff,     )
                                    )      Date:  November 2, 2012
5      vs.                          )
                                    )      Time:  10:20 a.m.
6      Jacqueline L. Wheeler,       )
                                    )
7                    Defendant.     )

8      _____

9
                        TRANSCRIPT OF SENTENCING
10                           HELD BEFORE
                  THE HONORABLE ELLEN SEGAL HUVELLE
11                 UNITED STATES DISTRICT JUDGE

12     _____

13
       APPEARANCES:
14

15     For the United States:    Lionel Andre
                                 Dangkhoa T. Nguyen
16                               U.S. Attorneys Office
                                 555 Fourth Street, NW
17                               Suite 430
                                 Washington, DC   20001
18

19     For the Defendant:        Shawn J. Chen
                                 Delante Stevens
20                               Cleary, Gottlieb, Steen & Hamilton
                                 2000 Pennsylvania Avenue, NW
21                               Washington, DC   20006

22
       Court Reporter:           Vicki Eastvold, RMR, CRR
23                               Official Court Reporter
                                 U.S. Courthouse, Room 6722
24                               333 Constitution Avenue, NW
                                 Washington, DC  20001
25
```

1          THE DEPUTY CLERK:  This is criminal case 11-151,

2    United States of America versus Jacqueline Wheeler.  I'm

3    going to ask counsel to come forward and identify themselves

4    for the record.  We also have present Kelly Kraemer-Soares

5    from the probation department.

6          MR. ANDRE:  Good morning, Your Honor.  Lionel

7    Andre and Dangkhoa Nguyen on behalf of the United States.

8          THE COURT:  Good morning.

9          MR. CHEN:  Good morning, Your Honor.  Shawn Chen

10   and Delante Stevens from Cleary, Gottlieb, Steen & Hamilton

11   on behalf of Ms. Wheeler.

12         THE COURT:  Good morning.

13         Good morning, Ms. Wheeler.

14         First, Mr. Chen, before you sit down.  You've read

15   the pre-sentence report?  Your client has read the

16   pre-sentence report, is that correct?

17         MR. CHEN:  That's correct, Your Honor.

18         THE COURT:  And all objections have now been

19   incorporated, I assume, in your sentencing memorandum.

20         MR. CHEN:  Correct.

21         THE COURT:  Okay.  And the same for the

22   Government?

23         MR. ANDRE:  Yes.  Yes, Your Honor.

24         THE COURT:  Ms. Wheeler, have you read the

25   pre-sentence report?

1          THE DEFENDANT:  Yes, ma'am, I did.  Yes, ma'am, I

2    did.  And there are some things that were not corrected from

3    the initial report to the second report to the last report

4    that was October the 2nd.  It was in a letter that I tried

5    to send you that was taken from me at the jail.

6          THE COURT:  Well, you'll have an opportunity -- if

7    you want to put on the record -- some things are not, quote,

8    material.  I don't know if you've discussed it with your

9    counsel.  I mean, a lot of -- some objections need not be

10   resolved.  The only objections I need to resolve are the

11   ones that bear on the calculation of the sentencing

12   guidelines.

13         THE DEFENDANT:  Oh.

14         THE COURT:  So I don't know if -- I realize -- I

15   mean, there are issues in the guidelines having to do with

16   position of trust, the intended loss, sophisticated scheme.

17   And the last one was -- put aside forfeiture and restitution

18   for a minute -- vulnerable victims.  I'm not aware of

19   anything else I need to resolve.

20         MR. CHEN:  No.  That's correct, Your Honor.  In

21   terms of the guideline calculations, those are the issues

22   that have been addressed in both the Government's and the

23   defendant's sentencing memorandum.

24         THE COURT:  Okay.  I think I should resolve those

25   first.

1          MR. CHEN:  I agree, Your Honor.

2          THE COURT:  Mr. Andre, I've got a question or two

3     for you.  The Government has asked me if "sophisticated"

4     means -- I think -- let's see if I get the right -- under

5     2B1.1(b)(9)(C).  That's one thing.

6          I don't really think this scheme is

7     "sophisticated" particularly complex or intricate.  I don't

8     really see that that enhancement applies very well.  It

9     seems pretty garden variety to me.  And in some ways, it's

10    highly unsophisticated.  You know, the Government's proof

11    was pretty easy to make, in a way.  It's only a shame that a

12    computer didn't spit it out years ago.  There are only so

13    many hours in a day, so to speak.

14         So I really don't -- unless everything that's a

15    fraud on Medicare is sophisticated, I would reject the

16    application of that enhancement.

17         I wanted to ask you a little bit about the

18    vulnerable victims.  There's no question the population

19    constitutes vulnerable victims.  I think the issue is

20    whether or not they were harmed.  And I'm having some

21    difficulty -- you have the burden on this, if I'm correct.

22    What is it that I would have to point to that would sustain

23    that two-point enhancement?  This is under 3A1.1(B)(1).

24    There are, basically, four enhancements, four points, that

25    are at issue here.  Two for vulnerable victims and two for

1    25 or more.  The latter is not the problem.  It is whether

2    or not these people have been harmed in some way that the

3    evidence can show.  I don't have any doubt that this

4    operation wasn't necessarily well run.

5         MR. ANDRE:  Well, Your Honor, I think the harm --

6    I think it came up repeatedly during the defense case, as

7    well as the Government's case, that these individuals had

8    double and triple diagnoses --

9         THE COURT:  I say, it's conceded they're

10   vulnerable.  There's not a doubt.  That part of the issue is

11   not at issue.  That part of the definition is not at issue.

12   Sorry.

13        MR. ANDRE:  But the harm -- the way they're harmed

14   is because they were being, basically, just warehoused, they

15   weren't receiving all of the treatments that they could have

16   used for all of their issues that they had both mentally,

17   physically; and from the evidence, you know, these

18   individuals were used for things such as walking the dogs,

19   cleaning, and domestic work.  And the time that they spent

20   doing those types of work is time that they're not getting

21   the treatment that they needed.  And so --

22        THE COURT:  Well, that's the issue.  I mean, how

23   do I find what they need or not need?  I mean, on what basis

24   do I make such a conclusion that in some way that the

25   evidence satisfies me that by a preponderance there was

1       something that they should have gotten, they didn't get?

2               I'm hard-pressed to -- you know, it's one thing if

3       walking the dog or doing household chores was harmful.  I

4       don't know that it's harmful.  It's productive work, in a

5       sort of odd way.  But I don't know how you or I can look at

6       the evidence and decide what is in somebody's -- what did

7       they need.  I don't have much to hang my hat on there.

8               MR. ANDRE:  Your Honor, we just rely on the record

9       evidence of what these individuals spent most of their time

10      doing; just sitting around watching TV and being -- you

11      know, transported to the group housing, to the facility.

12      And pretty much --

13              THE COURT:  Do you have any case?  I've read some

14      cases.  Just not quite -- there's one in DC, for instance.

15      They were being treated by unlicensed practitioners.  And

16      they -- another one, I believe from the Second Circuit, they

17      got false diagnoses.  There you can see specific things that

18      were part and parcel of the scheme.  They got substandard

19      care.

20              I don't know.  Mr. Chen, do you want to just -- do

21      you have anything further?  Your pleadings were, as usual,

22      very good and caused me some difficulties.

23              MR. CHEN:  I apologize for causing the Court

24      difficulties.

25              THE COURT:  No, no, no.

1          MR. CHEN:  But I appreciate the compliment,

2     Your Honor.

3          THE COURT:  You have to take these matters -- they

4     are serious, because every two points make a difference,

5     obviously.

6          MR. CHEN:  Absolutely, Your Honor.  And obviously,

7     Ms. Wheeler appreciates the Court's attention to these

8     issues.  I do think that the argument that the Government is

9     making here is entirely speculative.  I don't think they can

10    point to anything in the record that shows that the patients

11    would have received any different or some -- you know,

12    better care than what they received while under the care of

13    Health Advocacy Centers.  In fact, all of the testimony,

14    including that of Dr. Sheila Jones and that of the

15    Government's two principal witnesses, Donald Payne and

16    Michael Kirk, were that, quote, "Ms. Wheeler would never

17    neglect," close quote, the patients.  And instead she did

18    her best to ensure that they had housing, were fed, received

19    their medication, went to various medical appointments, as

20    well as engaged in other types of, you know, day-to-day

21    daily living activity.  I don't think that the Government

22    can say that had they been placed in a different group home

23    or a different medical facility that they would have, you

24    know, spent the time that they spent watching television

25    doing something else.  I think that's entirely speculative.

1    And, in fact, I think common sense indicates that for people

2    who are severely mentally and physically challenged, the

3    fact of the matter is that they actually do spend a fair

4    amount of their time, for better or for worse, you know, in

5    group homes simply sort of, you know, engaged in, as best an

6    existence as they have.

7              THE COURT:  But, I mean, the truth of the matter

8    is some people can be very productive despite disabilities

9    and some are less productive.  I have to say that I've had

10   extensive experience with the government system here.  And I

11   wouldn't know anything about the individuals who pass

12   through this.  And that's why I find it difficult to find

13   that the evidence can convince me by a preponderance that

14   the Government has shown that the individuals were harmed.

15   I mean, you could speculate they were, but that's not the

16   basis for my -- I can't proceed on that basis.

17             The other one I need to address is who's got the

18   burden on the loss issue?  It seems to me that we have a

19   figure of 3.1 to start with.  And you concede, if I'm

20   correct, that the figure is at least below 7 million.

21             MR. CHEN:  That's correct, Your Honor.

22             THE COURT:  The so the question is:  Do you have

23   the burden of satisfying me that there's a figure below 7?

24   Or is it the Government?

25             MR. CHEN:  I think, Your Honor, as always, in

1    seeking any enhancement, the Government bears the burden of

2    proof by a preponderance.  We do acknowledge that there is a

3    Fourth Circuit case, *United States versus Miller,* that

4    indicates that in the Medicaid billing context the amount

5    that's billed is *prima facie* evidence.  I don't think that

6    that in any way shifts the burden of proof.  But, instead,

7    what it raises is the question of whether or not there is

8    other evidence.

9          And in this case, there was clearly testimony from

10   the Government's own witnesses that Medicaid would never pay

11   above the amount that was listed in the schedule.  And,

12   therefore, I think that rebuts any kind of *prima facie* case

13   the Government can show to indicate that Ms. Wheeler had no

14   intent of causing any harm beyond the $3,000,000.

15         THE COURT:  I have to make the decision based on

16   her state of mind.  So what evidence do I have of that?  I

17   know what was billed and I know what was paid.

18         MR. CHEN:  Sure.  Your Honor, taking the

19   Government at its own proof, the Government submitted

20   documentary, as well as testimonial evidence, that

21   Ms. Wheeler was the signatory on the Medicaid provider

22   application.  That indicated that she had read the manual

23   and other billing guidelines that were incorporated by DC

24   Medicaid.  That she was the person who on a number of

25   occasions had contacted Affiliated Computer Services, or

1    ACS, regarding AJC's billing.  On none of those occasions is

2    there any evidence to indicate that she sought or requested

3    the actual higher amount that was billed, but only was

4    checking to see about the amounts that were subject to the

5    Medicaid cap.

6         THE COURT:  I don't actually understand how the

7    system works if people can put in -- if Medicaid only pays

8    A, and you submit something that's sort of wildly different

9    than A, is that just the way it goes out in this world of

10   billing Medicaid?

11        MR. CHEN:  Your Honor, actually, it's not limited

12   to Medicaid.  My understanding is that in the medical

13   profession generally, health care providers are supposed to

14   charge the same amount regardless of the type of coverage

15   that a patient has; whether it's Blue Cross Blue Shield,

16   Medicaid, or whether somebody's paying out-of-pocket.  So as

17   a result, the common practice is to bill at a certain level

18   that is generally higher than the caps that either the

19   insurance company or Medicaid will ever allow to be

20   reimbursed so that, for example, if the patient were paying

21   out-of-pocket they would pay $100 per visit.  But the

22   understanding, of course, is that Blue Cross Blue Shield, or

23   whomever, would never pay that amount.

24        THE COURT:  So it's not limited to manual therapy.

25   It's across the board.

1           MR. CHEN:  That's correct, Your Honor.  And it's

2     -- it's -- it's standard practice in the medical profession.

3           THE COURT:  All right.  What do you have to say

4     about that, Mr. Andre?  We're now under the issue of

5     3B1.1(b)(1)(K).

6           MR. ANDRE:  Are we talking about intended loss,

7     Your Honor?

8           THE COURT:  Yes.  Exactly.

9           MR. ANDRE:  The intended loss is by the

10    preponderance of the evidence.  I mean, we introduced the

11    documents that it's the billed amount of $7.7 million.

12    There were documents that were the Excel spreadsheets that

13    came directly from the bills.  And that's $7.7 million.

14          The defense cites *Miller*.  And that's simply not

15    the law.  Even in *Miller* they talk about it's on a

16    preponderance of the evidence that you need.  And the real

17    -- I think the Court has to look at *Sturdevant*.  I think

18    we've proven -- that's DC Circuit Court from 1997.  And --

19          THE COURT:  What is?

20          MR. ANDRE:  The *Sturdevant* case, which is 116 F.3d

21    1559.  And it rejected the economic reality argument and it

22    limited the intended loss amount to defendant's subjective

23    intent to what is possible, likely.

24          THE COURT:  What's wrong with that test?  It

25    looked to me like that was repeated over and over again.

1          MR. ANDRE:  I'm sorry?

2          THE COURT:  Are you rejecting that test?

3          MR. ANDRE:  I mean, the test is -- I mean, the

4    evidence that we have to establish is that the intended loss

5    is -- we prove that by a preponderance of the evidence based

6    on the bills that she submitted.  And that's clearly $7.7

7    million.  We introduced the documentary evidence of that.

8          THE COURT:  She submitted bills.  We all agree.

9    What he's saying is that it's known that she didn't intend

10   to recover 7.7 because the billing for these people -- you

11   know that none of them have their own funds.  I mean, you're

12   not telling me that anybody would pay a co-pay or an over.

13   So that the only thing she's going to get, if she

14   understands this system at all -- which the premise of your

15   case is that she understands the system well enough to

16   defraud it -- the premise is that she couldn't intend to get

17   back more than the $24 per unit for manual therapy because

18   the subjective intent has to be based on what she knew about

19   the system, which is that they don't ever reimburse for 100

20   percent.

21         MR. ANDRE:  Well, Your Honor, we can't get into

22   her mind.  She didn't testify, and she offered -- there was

23   no evidence offered as to her intent.  But we know from the

24   communications she had with ACS that there were bills that

25   she kept resubmitting in an effort to get reimbursed and

1    paid for things that she knew she hadn't provided.

2              THE COURT:  Well, that's a different issue.  This

3    is the question of whether -- everybody agrees -- I don't

4    think they contest -- well, they do up to a certain point.

5    But they don't contest that it goes up to 7 million.  That

6    it's somewhere between 2.5 and 7.  The issue is whether over

7    7 million, when you know that she couldn't possibly get back

8    from Medicare -- and she should know, and the question is

9    did she know -- that she wasn't going to get 7.7 million no

10   matter what.  It's not a question of billing for things that

11   -- whether they were provided or not provided.  It's a

12   question of what Medicare -- Medicaid would reimburse for.

13   And that cap we know.

14             MR. ANDRE:  Your Honor, we submit that's pure

15   conjecture.  There's no way for to us know what she intended

16   or what she knew.

17             THE COURT:  Well, you agree with me that the

18   system wouldn't have allowed it.

19             MR. ANDRE:  For her to get the full amount of --

20             THE COURT:  Yeah.  The $100 per, you know, manual

21   therapy, as opposed to 24.  There's no issue about that.

22   That's why you've come up with a figure of 3.1.

23             MR. ANDRE:  That's what she was actually paid,

24   right.

25             THE COURT:  But you and I agree that she couldn't

1    have been paid 7.7.  And she had to know that.  There's no

2    way that -- she can bill 7.7, but it's like she could have

3    billed them 24 million, too.  But there is a cap on the

4    services that would be what they paid.

5           They paid things that were fraudulent.  There's no

6    question about that.  But it doesn't mean that the 7.7

7    million should be the figure that you've proven if I'm

8    supposed to consider it.  You may have a *prima facie* case of

9    7.7, but I'm supposed to understand what the intended loss

10   was.  That means her subjective intent.  And your argument

11   is there's no way I can figure out what her intent was.

12          MR. ANDRE:  Your Honor, where would we stop?  I

13   mean, between the sliding scale, where would it stop?  If

14   it's not 7.7, and to the scale of what she actually got, at

15   what point -- we don't know that, whether it would be 4

16   million, 5 million, 6 million.

17          THE COURT:  I don't have to figure that out.  All

18   I have to do is the guidelines.  The guidelines tell me two

19   points if it's over 7 million, two points if less, it's 18

20   if it's less than 7 million.  So it may be a question for

21   some other issue.

22          But my point is that the case you just cited to me

23   is consistent with other cases which has to do with what is

24   -- the intended loss has to be based on her actual

25   subjective intent, not just sort of what did she bill.  If

1    it were possible to recover 7.7, then your argument's very

2    good.  But it isn't, is it?  I mean, that's the whole point

3    about the Medicare -- or, Medicaid.  Sorry.  Strike that.

4         MR. ANDRE:  Well, I mean, the actual loss was not

5    7.7.  It was a specific amount.  But we --

6         THE COURT:  But the point of the loss -- I

7    understand.  The loss -- an intended loss could be greater

8    than 3.1.  There's no question.  But can it be over 7

9    million when there's no way that of all the expenses in 13A

10   -- the computer spits out a lot of them because they're not

11   going to pay beyond 24, whatever it was, $24 for a 15-minute

12   unit.  So to bill that unit for more than $24 is, in a

13   sense, may be standard practice but it in reality an

14   exercise of futility.  And you can't say that she wouldn't

15   have known that.  I mean, that's sort of -- you don't have

16   anything to suggest that -- I mean, the going -- that

17   Medicaid pays what the limits are, and that's it.  They

18   don't pay more.  Depending on your bill.

19        MR. ANDRE:  Right.  That is true.  There is a

20   limit at which insurance companies will reimburse for

21   different services.

22        THE COURT:  Right.  And so my only point here is

23   an intended loss is -- this doesn't -- we don't have to

24   worry about whether she billed for services that weren't

25   provided.  The only question -- because that figure -- the

1    range we're dealing with is 2.5 million to 7 million.  And

2    the only thing you say is what?  7.7?

3              MR. ANDRE:  7.7 is what she billed, right.

4              THE COURT:  So my point is that the -- I'm not

5    getting down to every penny, in a way, because the question

6    is that the -- how many --

7              Mr. Chen, do you know how many hours -- or, how

8    much of this -- well, we do know.  Between the 7.7 and the

9    3.1 is what Medicaid threw out, right?  That's just their

10   automatic "we're not paying this overage," so to speak.

11             MR. CHEN:  That's correct.  And they never paid

12   the overage, despite the fact that physicians every single

13   day -- even ones who are providing appropriate services --

14   bill for more than the cap.

15             THE COURT:  Right.  So that the only question

16   would be whether or not you could show that of 3 -- more

17   than $3,000,000 there were no services provided.  And I

18   doubt that's possible.  Because what we know here is that

19   even if you decide that all of this is fraudulent, she

20   didn't get -- it's hard to say that the evidence would show

21   she intended to get paid 7.7.  Because the system is built

22   in with this cap.

23             MR. ANDRE:  Your Honor, we would submit that

24   there's absolutely no evidence of her knowledge.  And it

25   wasn't from lack of trying.  Because she kept resubmitting

1   the bills to try to maximize what she would get.  And what

2   the defense is asking is -- then at what point do we stop?

3   I know Your Honor says, well, you just need to decide if

4   it's less than 7 million.  But we don't know -- we have no

5   evidence what her knowledge was and what her belief was.

6          THE COURT:  Well, yeah, except that I think that

7   to uphold the jury's finding here I have to uphold the

8   Government's theory that she had enough knowledge to know

9   what she was doing; i.e. that manual therapy -- you couldn't

10  bill $4,000 for a 15-minute unit.  I mean, I have to work on

11  that premise.  Otherwise, there's something defective in the

12  jury's verdict, which I'm unwilling to accept.  I think the

13  jury understood.

14         Okay.  Let's hear from Mr. Chen briefly, and then

15  I'll make my calculations.

16         MR. CHEN:  Just to be clear before the Court rules

17  on this.  The Government's -- sorry -- the defendant is

18  entirely willing to accept the Government's concession made

19  just now, that there was no evidence of --

20         THE COURT:  Yeah, I know you are.

21         MR. CHEN:  -- of Ms. Wheeler's intent.  We are

22  fully prepared to accept that concession, Your Honor.

23         THE COURT:  I think Mr. Andre didn't quite mean

24  that.

25         MR. CHEN:  But I think it does point a fundamental

1   flaw that the Court has highlighted in the Government's

2   logic here, which is the Government can't have it both ways.

3   They can't point to the Medicare provider application, her

4   signature, her interactions with ACS on the one hand; and

5   claim that she knew, you know, how much time one unit

6   equalled and how much, therefore, one could possibly bill in

7   a 24-hour day, and yet on the other hand didn't understand

8   what the Second Circuit in *United States versus Singh* said

9   was, quote, common knowledge that Medicaid and private

10  insurers pay only fixed rates for certain medical

11  procedures, and it does not require, quote, a leap of logic

12  to infer that the defendant -- in this case "he" -- knew

13  full well that he would not be entirely reimbursed for his

14  billing claims.

15          THE COURT:  I don't have any evidence that shows,

16  even despite her constant communication with the Medicaid

17  people, that she was seeking to get more than they capped

18  them out.

19          MR. CHEN:  Well, that's correct, Your Honor.  And

20  I want to clarify one thing that -- I'm not sure if I

21  understood the Government correctly.  But when the

22  Government said that she would constantly seek to ensure

23  payment or that she would resubmit payment.  I don't think

24  there's any proof, Your Honor, that once a payment was made

25  at the capped level, Ms. Wheeler never then tried to

1    resubmit that payment or contact ACS to somehow get the

2    overage paid to HAC.

3              THE COURT:  Okay.  All right.  Well, the Court's

4    first job here is to do the calculations.  There are a

5    couple of issues.  One I've already ruled on.  I'm not

6    adding two for sophisticated scheme.

7              The probation office came up with an offense level

8    of 28.  That would then produce 78 to 97 sentencing range, I

9    believe.  The defendant contests several of those

10   calculations.

11             Their first objection is as to the loss.  I'm

12   satisfied that the Government can't show by a preponderance

13   that she intended to recover 7.7.  It wasn't possible under

14   any definition.  And there isn't anything in the evidence to

15   indicate that she ever believed that anything more than the

16   cap was recoverable.  So I have to conclude that it should

17   be 18 instead of 20 in terms of the intended loss amount

18   under 2B1.1(b).

19             The defendant contests two points for the position

20   of private trust -- abuse of position of private trust.  The

21   Court will uphold the probation department's finding there.

22   I think that she certainly did the billing.  There may be

23   evidence that someone else may have, on occasion.  Even if

24   Hastings had some role in the medical care, and she may have

25   said in her grand jury testimony she was the boss, she in

1    fact during the relevant time period was not in the

2    managerial position with respect to the operation of HAC or

3    Sheridan.

4          And this is a case where -- there are many cases

5    where health care providers defrauded Medicaid and they

6    found the manager who controlled the bank accounts and was

7    entrusted to manage the affairs or the manager responsible

8    for assigning work and approving purchases, or someone who

9    was an office manager, all constituted people in positions

10   of trust.  So the Court finds that she occupied a position

11   of trust and abused it, so the two points will apply.

12   That's under 3B1.3.

13         The last issue that the Court has to determine is

14   the one about vulnerable victims.  The Government would

15   argue for a four-point enhancement on the grounds that there

16   had been harm to these individuals.  Again, the Court will

17   reject that argument.

18         Although they were clearly vulnerable, and clearly

19   were the vehicle, so to speak, here for her to get money

20   that she did not earn or deserve.  But at the same time, I

21   don't know based on the evidence.  I have my suspicions,

22   obviously.  But I don't think I can say the Government has

23   shown by a preponderance that these people were actually

24   harmed.

25         I can't tell how much TV was good or not good, or

1        should or should not have been watched.  I can't tell

2        whether doing household chores is useful or not useful.  I

3        mean, it's a very highly complicated issue.  I don't have

4        the typical case where there's somebody who isn't licensed

5        or that somebody gave incompetent services or that there was

6        a false diagnosis or medication being prescribed that

7        shouldn't have been prescribed.  I mean, the typical case is

8        something that shows either direct or indirect harm.

9             So the Court, given those rulings, comes out with

10       an offense level of 26 and a guideline range of 63 to 78.

11       So at this time -- I have no doubt what the Government's

12       position is.  But, Mr. Andre, I'll have you address the

13       Court first.  But I have made my determination that it's

14       criminal history of I and 26.  And my only difference with

15       the probation report is the 20 points under paragraph 41.  I

16       find it should be 18.

17            MR. ANDRE:  Well, Your Honor, this is a case where

18       from day -- from the case started, even pre-trial, we made

19       many efforts to reach out to Ms. Wheeler, show her the

20       evidence, and try to give her an opportunity to accept

21       responsibility.  And offered, I think, at that time a

22       sentence of -- I think it was in the range of around 46

23       months was her exposure.  And she, you know, repeatedly

24       rejected all plea offers.  She put the Government to its

25       burden.

1          But as Your Honor heard the testimony develop,

2     this -- these clinics -- or this clinic, the Sheridan Rehab,

3     Oxford School of Nursing, all these facilities that she

4     operated out of 919 Sheridan, was all designed to line her

5     pockets and profit at the expense of some of the most

6     vulnerable individuals in the District of Columbia, whom she

7     was entrusted to care for them.

8          No doubt she did provide some food, some clothing,

9     and had these individuals in shelters.  But you heard --

10    there was testimony of Mardya Potts, for instance, where she

11    was forced to sit in a room with a patient that had open

12    sores and didn't want to be touched; but yet she was ordered

13    to sit in that room with that patient for a specified time

14    so that defendant Wheeler can bill Medicaid.

15         You heard witness after witness to the point where

16    I think the Court said, Move on.  What does this have to do

17    with false billing?  But the Government wanted the Court to

18    just understand what was happening in that facility.

19         The conditions were horrible.  Dog feces and

20    urine.  You know, and these are the conditions that these

21    patients had to subject -- go in on a day-to-day basis.  And

22    with the locked gates.

23         And when defendant found out that the government

24    was on to -- was about to question what was going on inside

25    that clinic, she -- you heard testimony that she denied --

1    did not want to let law enforcement in and moved those

2    files.  And the reason why she moved the files is because

3    she did not want the government to uncover her fraud.

4         That is in itself an obstructive type conduct.  I

5    understand that there was no obstruction points given.  But

6    that, to me, Your Honor, I think is clear evidence that she

7    knew what she was doing was wrong, she knew contained within

8    those patient files were evidence that these patients were

9    being treated elsewhere, at other hospitals, for months at a

10   time at a time when she continued to bill DC Medicaid.  This

11   is conduct that went on for a prolonged period of time, it

12   was calculated and it was all guided by greed.

13        And something else in this case, Your Honor, that

14   -- because I think both defense brought this out and I think

15   should be made clear.  One solid victim in this case is

16   Alicia Hastings.  Dr. Hastings was a pioneer, and one of the

17   most well-respected doctors at Howard University.  And she

18   trusted defendant Wheeler and worked out of that place with

19   defendant Wheeler.  In fact, moved out of her home to live

20   in the basement of defendant Wheeler.

21        Defendant Wheeler, basically, till this day still

22   is dragging Dr. Hastings' name into her fraudulent scheme.

23   This woman is now a ward of the state.  A preeminent

24   prominent doctor that's well respected is now living in

25   poverty, is a ward of the state, with no assets to speak of,

1    as a direct result -- and this occurred while she was under

2    the care of defendant Wheeler.  This woman had submersion

3    burns, had her leg amputated, and spent nearly a month in a

4    burn unit at Johns Hopkins.  And this is while she was under

5    the care of defendant Wheeler.

6           This gives Your Honor a picture of who this

7    defendant is and what she's capable of doing, and which is

8    why in the Government's recommendation we ask for the

9    maximum sentence for her.  Because she deserved the maximum

10   sentence, Your Honor.  This is for punishment, specific

11   deterrence, general deterrence.  She deserves the maximum

12   sentence that is guideline compliant in this case.  And

13   followed by supervised release.

14          And as a condition of her supervised release, she

15   should be -- once she's released she should be required to

16   perform community service, and she's not to have any

17   involvement in the health care profession whatsoever.  And

18   that is -- and, also, the Government will recommend that the

19   Court order forfeiture in the amount $3,168,559.28.  That

20   being in the form of a money judgment.

21          THE COURT:  Do you agree if there's anything

22   recovered in forfeiture, it ought to be credited to

23   restitution and vice versa?  I mean, you're asking -- and

24   you're entitled to ask for an order of restitution in

25   forfeiture.  It's not -- but I'm just saying I think there

1    ought to be offsets if there is anything recovered under

2    one.

3          MR. ANDRE:  Your Honor, that -- restitution is

4    mandatory, and forfeiture is -- serves a separate function.

5    In this case, the Government would not be so obliged to make

6    such a recommendation to the asset and money laundering

7    section of the justice department.

8          Because one of the concerns we also have,

9    Your Honor, is this defendant has been very capable of

10   hiding -- we don't still to this day have a full grasp of

11   all of her assets.  And we would ask that Your Honor order

12   her to submit financial statements and to identify and

13   locate all of her assets, including real estate holdings

14   that she may have in the names of nominees.  And she should

15   identify vehicles that she owns.  She should submit a

16   financial statement so that we can determine and locate all

17   of her assets.

18         THE COURT:  Okay.  Mr. Chen, let's just focus for

19   two seconds, to begin with, about the last thing requested

20   by the Government.  And second of all, the restitution

21   forfeiture issue.

22         MR. ANDRE:  I'm sorry.  I apologize.

23         THE COURT:  By the way, forfeiture is clearly

24   gross proceeds, and so the 3.168 figure is correct as a

25   matter of law.  It doesn't matter whether or not anything

 1    was provided.  The statute makes it quite clear that it's --

 2    18 U.S.C. 982(a)(7) provides for gross proceeds, forfeited

 3    property, real or personal, that constitutes or is deprived

 4    directly or indirectly from gross proceeds traceable to the

 5    commission of the offense.

 6              So I think that the forfeiture order is proper.

 7    Sorry.

 8              MR. ANDRE:  Before continuing -- I apologize,

 9    Your Honor -- we do have a representative of the victim, the

10    Department of Health Care Finance -- who would like to

11    address the Court and I believe provided the Government this

12    morning, I think copy has been provided to defense counsel,

13    a written statement.  And I believe that individual would

14    like to address the Court.

15              THE COURT:  That's fine.  But I didn't get the

16    statement.  If you want to -- you going to give it to me?

17    Or is the person going to say it?

18              MR. ANDRE:  Your Honor, we will provide --

19              THE COURT:  Have a seat for a minute.

20              MR. ANDRE:  We just received it moments ago,

21    Your Honor.  And we will get the Court a copy.

22              THE COURT:  Good morning.  If you could give us

23    your name.

24              DONALD SHEARER:  I'm Donald Shearer, Director of

25    Health Care Operations with the Department of Health Care

1      Finance.

2                  THE COURT:  And, sir, do you want to just speak to

3      -- at this time?  You can submit the statement.

4                  DONALD SHEARER:  There's a prepared statement with

5      the supporting documentation, Your Honor.

6                  THE COURT:  Just why don't you give me a short --

7      is this your exhibit, sir?

8                  DONALD SHEARER:  Yes.

9                  THE COURT:  Mr. Andre?  Have I ever seen this

10     exhibit before?

11                 MR. ANDRE:  No, Your Honor.  I just received it.

12     That was my copy I just handed to the Court.  I will get a

13     copy from Mr. -- I'm sorry.  Your Honor, we can give you the

14     signed copy at the conclusion of --

15                 THE COURT:  I have some problem here.  I think

16     that the amount of restitution that was asked for was 3.1.

17     $3,168,559.  I will not be able to reach the question of

18     restitution if we need to take up evidence.  And that looks

19     to me like what's going on here.

20                 DONALD SHEARER:  So the evidence that was

21     presented in court, Your Honor, covered dates through April

22     2008.  And what you have is a copy of a report that covers

23     dates of service beginning in May 2008 where the defendant

24     continued to bill for hours in excess of what the Court

25     decided was normal, what the jury decided was normal.  That

1    amounted to an additional payment in the amount of $755,000.

2            THE COURT:  Well, there are a couple other

3    problems.  You don't know, do you, whether manual therapy

4    was actually provided.  In other words, we had testimony

5    that some people did get manual therapy.

6            DONALD SHEARER:  Right.

7            THE COURT:  This would include all billing for

8    manual therapy.

9            DONALD SHEARER:  This is for hours in excess of

10   ten hours in a day.

11           THE COURT:  Oh.  But that's not where we got the

12   figure 3.1, is it, Mr. --

13           How much did -- how much did Medicaid pay for

14   manual therapy?

15           DONALD SHEARER:  I think that's the 3.1.  And then

16   this report covers just manual therapy for hours that were

17   40 hours -- 40 units or more in a given date of service.

18           THE COURT:  So the post-April figures do not

19   include all that got billed for manual therapy.

20           DONALD SHEARER:  This is manual therapy from May

21   2008 through -- I think it's August of 2008, Your Honor.

22           THE COURT:  Okay.

23           DONALD SHEARER:  And Court had just said that the

24   scheme continued beyond the date that was covered in the

25   court -- in the state's case.

1          THE COURT:  Let me say this about restitution.

2     It's very complicated legal issue, put aside what the

3     numbers show or not show.  Restitution, unlike forfeiture,

4     is supposed to be actual loss.  And so the figure of 3.1 for

5     the period of time you covered might be high by some

6     undetermined sum.  Your figure may not be for the period of

7     May through August.

8          The figure 3.1 may also not be high because there

9     were billings for things other than manual therapy.  But my

10    restitution order really hangs on who's got the burden.  And

11    I must say in this instance I am not going to order 3.9

12    because I don't think that we've had the sufficient notice.

13    And they're entitled to contest this.  And I think that it's

14    not in anybody's interest to have an evidentiary hearing

15    down the road, which we're entitled to do under restitution.

16         Because it's clear that the Court's supposed to

17    make the best estimate possible.  The Government can't show

18    that she didn't provide any manual therapy.  But there's

19    plenty of case law to say the burden -- there's a split in

20    the circuits on who has the burden; some say the defendant

21    some say the government.

22         I am not going to resolve this question.  But

23    given what you've just shown me, which is ample evidence,

24    plus there's evidence she billed for things that weren't

25    provided, I am going to order restitution of $3,168,559.  I

1    think that the Court's obligation is, first of all, to come

2    up with a fair estimate of the loss.

3            I've now got additional evidence put forth in

4    front of me.  I don't think it's possible to determine how

5    many hours of manual therapy were provided here.  And given

6    her records, I hold her responsible -- I don't think it's

7    the Government's fault -- for not being able to have a

8    sufficient offset.

9            As a practical matter, there's a forfeiture under

10   the law which is consistent with 3.1.  So, therefore, I find

11   that it is more than a reasonable estimate to have a

12   restitution amount that is equivalent to the forfeiture even

13   understanding under the law that it should be the actual

14   loss.  But I think given the circumstances of the lack of

15   reliable records, potentially she should have the burden on

16   this because she's the only one that could have shown it.

17   And there's plenty of evidence to sustain any discrepancy.

18   So I am going to rule in favor of the Government for 3.1,

19   but I'm not going to use the 3.9 figure.

20           But we will include this in the --

21           Gwen, can you include this in the jacket?  And

22   this will be the Court's Exhibit 1.

23           This certainly is relevant to me, but it is not

24   going to up the figure that she has been told was the

25   restitutionary amount.  I think you'd be entitled to some

1    due process ability to contest that.

2            Mr. Chen, you want to put your objections to that

3    finding on the record?

4            This is Court's Exhibit 1, Gwen, which shows an

5    amount --

6            MR. ANDRE:  I will substitute out the Court's

7    Exhibit 1 that was actually signed by --

8            THE COURT:  And consistent with that, the Court

9    will sign the forfeiture order of $3,168,559.28.  So the

10   figures will be the same both for restitution and

11   forfeiture.  I don't think that anybody has any evidence to

12   give me a deduction or offset.

13           I will, though, provide in the judgment that the

14   Government will be entitled only to recover once.  And so if

15   they can get anything under forfeiture, it will be credited

16   to restitution, and visa versa.

17           Okay.  Do you object to the Court's restitution or

18   do you have any better way to come up with this?

19           MR. CHEN:  No, Your Honor.  I guess for the record

20   our position is laid out in the papers.  But I have nothing

21   further to add.  And I understand the Court's sort of

22   practical conundrum in terms of trying to identify any

23   better number than --

24           THE COURT:  Well, I was sort of perplexed -- not

25   "perplexed," I'm sorry.  I found the Sixth Circuit case,

1    it's K-P-O-H-A-N-U, 377 F. App. 519, 529 -- or Appx, I'm

2    sorry -- Sixth Circuit, where they found that the fact we

3    didn't have sufficient documentation shouldn't be held

4    against the defendant -- against the government, I'm sorry

5    -- in a restitution order.  They put -- the Sixth Circuit

6    does put the burden on the defendant.  But I think in these

7    situations it is not fair to fault them for not being able

8    to prove how much actual manual therapy.  So the restitution

9    order in the other one --

10          In the future, Mr. Andre, if you're going to ask

11   for something different in restitution, I really do need to

12   have advance notice.  If you are seeking -- there's a

13   difference between 3.1 and 3.9, obviously.

14          MR. ANDRE:  Your Honor, with all candidness, I was

15   unaware of this amount.  It's my practice to give the Court

16   and defense a heads up.  I think defense counsel's present

17   when this document was handed to me this morning.

18          THE COURT:  Right.  Okay.  I'm just saying there

19   is a provision under the restitution statute to allow the

20   Court to put off the issue.  But I don't know, given your

21   forfeiture order and all, as a practical matter, makes much

22   sense to put off and have another hearing down the road to

23   give them fair notice.  Okay.

24          All right.  Now we have our guideline range, we

25   have our restitution, we have our forfeiture.  And I'll hear

1     from the defense and Ms. Wheeler if she wants to be heard.

2             MR. CHEN:  And actually, in fairness to Mr. Andre,

3     he did provide me with the victim impact statement as soon

4     as he received it.  Likewise -- turnabout is fair play -- I

5     just received a number of supporting letters over the past

6     24 hours.  I gave a copy to Mr. Andre.

7             THE COURT:  All right.

8             MR. CHEN:  After they were given to me in court

9     this morning.

10            (NOTE:  Documents being provided to the Court.)

11            MR. CHEN:  I'd actually like to give the Court an

12    opportunity to read at least the first letter that was

13    handed on top, the one that's somewhat lengthy.  Because I

14    do think it actually bears directly on some of the issues

15    that the Court is facing in trying to craft a just and

16    appropriate sentence, one that is sufficient but not greater

17    than necessary to satisfy the purposes of sentencing under

18    Section 3553.

19            THE COURT:  Am I looking at this letter that's

20    typed?  Or the one that's --

21            MR. CHEN:  Correct.  Correct, Your Honor.  The one

22    that's typed.  It's written by someone who's actually known

23    Ms. Wheeler for a long time, as well as Dr. Hastings.  And

24    describes, I think, their interaction in a very candid and

25    thoughtful way.  One that is directly at odds with the

 1    Government's portrayal of the facts in terms of the

 2    relationship between the two, and one that's directly at

 3    odds with the Government's argument that Ms. Wheeler was

 4    simply motivated by greed or avarice.

 5              (Pause.)

 6              THE COURT:  The one that just was handed up --

 7    okay.  No.  It's different.

 8              MR. CHEN:  The handwritten letter, Your Honor,

 9    that the Court has is simply one from a fellow inmate that

10    Ms. Wheeler helped during her time.

11              (Pause.)

12              THE COURT:  Okay.  Thank you.  I think I should

13    put these in the -- they don't have any addresses.  I want

14    to take one address off so I can put them in the court file.

15    Okay?

16              MR. CHEN:  Thank you, Your Honor.

17              THE COURT:  All right.  I'm just making sure that

18    we don't have any personal -- okay.

19              MR. CHEN:  Your Honor, before I begin, I'd like to

20    apprise the Court of two things.

21              One, I have advised Ms. Wheeler not to make a

22    statement at sentencing, although she recognizes that she

23    has the right to do so, with the expectation that she will

24    file a notice of appeal.  I believe as a matter of

25    protecting her legal rights, it's prudent that she not make

1    a statement to the Court.  But I ask, obviously, that the

2    Court not hold that against her.

3              She did insist on me communicating to the Court

4    how much she appreciates the thoughtfulness that the Court

5    has had throughout these proceedings, as well as thanks to

6    probation officer Kelly Kraemer-Soares for putting together

7    such a thorough and, again, very thoughtful pre-sentence

8    report.  I think contains a lot of information regarding

9    Ms. Wheeler's background that I'm sure the Court has read.

10             The second thing is --

11             THE COURT:  I just want to verify, because she has

12   a right to speak.

13             Is it true, Ms. Wheeler, that you choose not to

14   speak -- address the Court at this time?

15             THE DEFENDANT:  Yes.  Yes, I do.  I choose not to

16   speak.

17             THE COURT:  All right.  I just want to make sure.

18             THE DEFENDANT:  Yes, it is.  That I choose not to

19   speak at this time.  And I thank Judge Huvelle for her

20   consideration and her respect.  Thank you.

21             THE COURT:  And just the last issue I brought up

22   before you start was this -- they are asking for her to

23   provide a financial statement to the Government, I guess.

24             MR. CHEN:  I'm not aware of the basis for

25   Government's request as a matter of sentencing for

1    Ms. Wheeler to submit a financial statement.

2            THE COURT:  What's the forfeiture order say?

3    Mr. Andre -- I mean, probation can require it.  But she

4    wouldn't be on unsupervised release right away, so --

5            MR. CHEN:  If the Court wants to impose it as a

6    condition of probation, defendant has no objection.

7            THE COURT:  I don't think I can do it otherwise.

8    I don't know.

9            Kelly?

10           MR. CHEN:  But --

11           PROBATION OFFICER KRAEMER-SOARES:  I'm not sure,

12   Judge.

13           THE COURT:  All right.  Well, okay.  Go ahead.

14   Sorry.

15           MR. CHEN:  But actually, just on that point before

16   I touch on some other issues, Your Honor.  I do think -- I

17   do take issue with the Government's statement that, you

18   know, Ms. Wheeler somehow has millions of dollars of assets

19   secreted someplace.  I think they, obviously, as the Court

20   knows from the voluminous exhibits that were presented, have

21   been able to identify any number of bank accounts either

22   belonging to HAC or Ms. Wheeler personally.  And they were,

23   in fact, able to trace -- I don't know what percentages, but

24   clearly the large majority of proceeds in terms of their

25   use.

1          One other point.  Although Ms. Wheeler has chosen

2     not to speak, I would beg the Court's indulgence.  There are

3     two individuals who traveled here from North Carolina who

4     would like to address the Court after I've finished

5     speaking.  One is the defendant's sister, Ms. Acquenet,

6     Dr. Acquenet Wheeler, who is sitting in the front row there.

7     And sitting next to her is Judge Carter, who's known the

8     defendant for many years.

9          Where I left off, Your Honor, in terms of the

10    Government's ability to, you know, review all the financial

11    information.  I think, actually, what that shows and what

12    all the evidence before the Court demonstrates is that

13    Ms. Wheeler was, in fact, not motivated by any desire to

14    accumulate wealth for herself or to somehow live an

15    extravagant lifestyle.

16         Again, I know I've reiterated this piece of

17    testimony a number of times, but I do think it is critical

18    to recall the testimony from the Government's own witnesses,

19    even Michael Kirk who the Court noted was extraordinarily

20    hostile to Ms. Wheeler.  But even Mr. Kirk acknowledged that

21    Ms. Wheeler always had the interests -- the best interests

22    of the patient at heart.  And regardless of the jury's

23    findings in terms of whether or not she may or may not have

24    violated the law, I think it's clear that there is really no

25    substantial evidence to show that Ms. Wheeler took these

1    proceeds and somehow used them to aggregate solely for her

2    own use and benefit.  Instead significant outlays were made

3    in terms of providing for the group home, providing for

4    food, shelter, providing for any number of other sort of

5    daily and even recreational activities for the individuals

6    who were patients of HAC.

7          I think what the probation officer's pre-sentence

8    report clearly indicates is that this is part of who

9    Ms. Wheeler is.  From the very early time when she graduated

10   from high school and left to go to college, and then left to

11   go to medical school, Ms. Wheeler has always been, for

12   better or for worse, looking out for others.  Whether it was

13   taking time off of school.  Taking time away, unfortunately,

14   from her studies to take care of family members who were

15   suffering from drug or other narcotics addictions at the

16   time, to help them fight the difficulties that they were

17   going through.  Whether it was trying to work in the medical

18   field despite the fact that she was unable to pass the

19   medical boards, but nonetheless had a deep commitment to

20   serving others and to looking after the welfare of others.

21         I think that that is a theme, Your Honor, that

22   runs throughout Ms. Wheeler's life.  And indeed I don't

23   think that people change.  I think that, if anything, this

24   flowed through her work at HAC Sheridan.

25         I think the critical question that the Court has

1    to address is whether, in fact, Ms. Wheeler is, as the

2    Government would contend, a truly bad person.  And I don't

3    think there's any indication that she is.  As I said before,

4    throughout her life she's devoted herself to helping others.

5         When the Government looked at all the financial

6    proceeds that it could identify, in each instance funds were

7    used to help the patients.  Even the home in Florida that

8    the Government points to repeatedly.  Again, the evidence in

9    the case and the documentation in fact expressly says that

10   the basic idea -- however misguided it may have been --

11   behind purchasing the group home in Florida was, again, to

12   have a place to take the patients to so they could try to

13   enjoy as good an existence as they could.

14        So I think, Your Honor, that when the Court fairly

15   and objectively evaluates the evidence, it has to come to

16   the conclusion that whatever mistakes or whatever misconduct

17   may have taken place here, it does not reflect who

18   Ms. Wheeler genuinely is.

19        And to turn a little bit to the way in which I

20   would suggest the Court apply the facts here to the law in

21   trying to ascertain a sentence that's sufficient but not

22   greater than necessary to satisfy the purposes of

23   sentencing, obviously we look to the factors that are

24   enumerated by Congress in the statute.

25        Obviously, there is a question of just punishment.

1    In this particular case, as the Court noted, the loss

2    amount, which is really what drives the calculation here to

3    a large extent, is in some ways purely a happenstance of

4    accident.  And if the issues had been identified earlier by

5    DC Medicaid or if the computer system had flagged this issue

6    earlier, the loss amount would have been substantially

7    lower.

8             THE COURT:  Well, that's like --

9             MR. CHEN:  It is what it is, Your Honor.

10             THE COURT: -- arguing, you know, if they had

11    arrested a drug dealer earlier, then he wouldn't have such a

12    large drug amount.  I don't know that that can carry much

13    water, frankly.

14             MR. CHEN:  I understand.  I understand the Court's

15    point.  I guess what I would suggest, though, is in trying

16    to determine the seriousness of the offense, and I think the

17    papers -- and I won't go through all the details here -- but

18    I think the papers reflect sort of the fact that in this

19    particular case there is the curious anomaly of the loss

20    amount driving the guidelines calculation.  And when one

21    compares that to other extraordinarily serious offenses,

22    ones that involve, you know, a clear danger to bodily harm

23    -- whether it's armed robbery or whether it's providing

24    material support to a terrorist organization or whether it's

25    manslaughter, Your Honor -- I don't think that there is any

1    fair comparison between Ms. Wheeler's conduct and sort of

2    similarly situated conduct that the guidelines would

3    otherwise hold as comparable if the Court were to simply

4    apply a strict, and in my view unfair, arithmetic

5    calculation under the guidelines and their provisions.

6    Under --

7              THE COURT:  So it would be -- sorry.  Go ahead.

8              MR. CHEN:  The other provisions, Your Honor, that

9    I'm sure the Court has considered are both general and

10   specific deterrence, the need to protect the public.  Again,

11   I don't think there's any question here that a lengthy term

12   of incarceration is necessary in order to protect the public

13   from Ms. Wheeler.  I don't think there's any indication that

14   she's likely to do anything that would harm the public in

15   the future.

16             In fact to the contrary, as some of the letters

17   that have been provided to the Court indicate, during her

18   time while in pre-sentence custody the defendant has

19   continued to try to help others in DC jail to provide some

20   kind of -- as one letter I think says -- sort of an older

21   kind of mothering sort of support to some of her fellow

22   inmates.  I don't think there's any indication that she's

23   likely to commit any offenses upon release.

24             And lastly, sort of the need for correctional

25   treatment.  I think that along those lines -- you know,

1    there is some indication that came out in evidence both at

2    trial and in the pre-sentence report that Ms. Wheeler would

3    benefit from working with others, working with counselors.

4    I think that, you know, we heard testimony about how she was

5    extraordinarily caring at times to people, but could be also

6    quite difficult to work with.  Could turn on a dime.  And I

7    think that there's at least some indication that she would

8    benefit from some sort of counseling or working with

9    psychiatry.

10           So, Your Honor, I think for all those reasons, the

11   Government believes -- I'm sorry -- the defense believes

12   that the guidelines range, even as calculated by the Court,

13   is higher than necessary to satisfy the requirements of

14   sentencing.  And accordingly, that a sentence of 48 months

15   incarceration is an appropriate sentence.

16           We've got -- if I can ask Dr. Acquenet Wheeler and

17   Judge Carter to come up and speak.

18           THE COURT:  Sure.  Could you give your name to the

19   court reporter, please?

20           ACQUENETTA WHEELER:  My name is Acquenetta

21   Wheeler.  A-C-Q-U-E-N-E-T-T-A.

22           THE COURT:  And you're a doctor?

23           ACQUENETTA WHEELER:  I am, sir.  Yes, Your Honor.

24   I am a physician.

25           THE COURT:  Physician?  And what city do you live

1    in?

2            ACQUENETTA WHEELER:  I live in Greensboro, North

3    Carolina.  And I am a pediatrician by training.  And I'm

4    currently employed by United Health Care as a medical

5    director.

6            Your Honor, I'm here today to show my love and

7    support for my sister at this unfortunate situation.  What I

8    would like for you and the Court to know is that Jackie has

9    always -- as we call her Jackie -- has always been extremely

10   compassionate person, always seeking out and helping those

11   in need or in trouble and doing what she can or what she

12   feels will help support them through their ordeal or

13   difficulty.

14           She has shared with me since her incarceration at

15   the Central Treatment Facility that she has fellow inmates

16   that are illiterate.  And she has worked with them to help

17   them with their reading skills and to be able to help read

18   for them.  She has also at times asked me to send internet

19   information about health care so that she can start -- by

20   mail -- so that she can start a newsletter for the treatment

21   facility.

22           Unfortunately, Jackie and I have not had a close

23   relationship over the past several years, but have grown

24   closer since her incarceration.  And I do see her trying to

25   bring order to her life as much as she can in the current

1     situation.  My heart's desire is not to be here today in

2     this situation; but I do want to support her because I love

3     her and I want to see the best for my sister in this

4     unfortunate situation.

5            I ask you, Judge Huvelle, to have mercy in your

6     decisions today that you make for my sister.  And that I

7     pray that your decisions are the least restrictive as

8     possible and that Jackie can use her skills and talents in a

9     meaningful way and be a success wherever she is.

10           And thank you for allowing me to speak today.

11           THE COURT:  Thank you for coming.  I'm sure your

12     sister appreciates it.

13           THE DEFENDANT:  Yes, I do.

14           THE COURT:  Sir, your name please?

15           JOHN CARTER:  John B. Carter, Jr.

16           THE COURT:  And you are from what state?

17           JOHN CARTER:  North Carolina, Lumberton.  And I'm

18     a District Court Judge there, and have been since 1994.  I

19     was a prosecutor for 15 years before that.

20           THE COURT:  Well, thank you for coming.  And you

21     know the defendant?

22           JOHN CARTER:  Very well.  Jackie has always been

23     one of my closest friends.  I'm not familiar with the facts

24     that have brought us all here today.  But knowing Jackie for

25     over 40 years, she has been one of the kindest, most

1    generous persons I've ever known.  She's always made

2    sacrifices for others, especially her family and friends.

3    And I think those sacrifices are one of the reasons why she

4    was never able to pass her medical boards.  And that was a

5    hardship for her.  But I've never known Jackie to do

6    anything that was for her benefit in the manner that has

7    brought her here.

8            And I know the verdict is what it is.  But I ask

9    the Court to think about the good that she's done so many

10   lives, including my mother's.  My mother suffered from

11   Alzheimer's, and Jackie was there to support me and my

12   mother when other relatives weren't willing to step forward

13   and do that.  I've never known her to do anything to benefit

14   herself in the manner that has been reflected in these

15   verdicts that were rendered by a jury.

16           I believe Jackie has a lot to offer people if

17   given an opportunity to come out of prison in a timely

18   manner and continue the good work she's done.  And I ask you

19   to consider this statement, the statement of her sister, and

20   the statements made by her attorney, and give her an

21   opportunity to return to society as quickly as possible and

22   begin a new life and put these deeds behind her.  And I

23   honestly believe that we will all benefit from that.

24           And thank you for allowing me to speak today.

25           THE COURT:  I appreciate your coming.  Thank you.

1     And I'm sure that Ms. Wheeler appreciates it.

2              If Ms. Wheeler could step forward with her

3     counsel.

4              MR. ANDRE:  Your Honor?  I'm sorry.  I know this

5     is -- I just want to point out -- I apologize.  I have to

6     speak.  This letter was provided to me momentarily right

7     before we started.  I just want to point out the letter for

8     Samuel E. Wilson MD that was written.

9              The very first paragraph is inconsistent with the

10    paragraph 69 of the pre-sentence report.  Specifically, it

11    says:  I have known Ms. Wheeler since 1985.  We met in

12    medical school.  And there was an emphasis on Medical

13    College Pennsylvania classmates in physiology.  We met on

14    from medical school and reunited.

15             And if Your Honor looks at paragraph 69 of the

16    pre-sentence report, there is no Medical College of

17    Pennsylvania mentioned at all with -- I mean, we don't know

18    who this person is.  There is something somewhat similar to

19    the Tawana Hart testimony of this letter.  And I just raise

20    that because it's inconsistent with the pre-sentence report,

21    which as counsel pointed out was thoroughly written and

22    thoroughly researched by the pre-sentence report writer.

23    And I don't see any mention of Medical College of

24    Pennsylvania.

25             THE COURT:  I don't know what Medical College of

1   Pennsylvania is.  It's up to you, Mr. Chen.

2          THE DEFENDANT:  Your Honor, Judge Huvelle, I did

3   go to Medical College of Pennsylvania.  I was there briefly.

4   I had to take a leave of absence when my father died.  And,

5   therefore, I did not pass physiology.

6          In medical school, that was the only course I

7   didn't pass that year.  So Meharry Medical College sent me

8   to Medical College of Pennsylvania to take physiology.

9   That's where I met Dr. Wilson.  I was there maybe for six

10  months.  And then I went back to Meharry to continue on with

11  my sophomore year.

12         THE COURT:  Where's he now?

13         THE DEFENDANT:  Dr. Wilson is an anesthesiologist

14  in Pennsylvania.  He went from New York to Pennsylvania.

15         THE COURT:  All right.  You know, this is --

16  counsel has made the argument that the question is whether

17  you're a good person or not a good person, or maybe he's

18  responding to the Government's argument.  Unfortunately,

19  under the guidelines and under sentencing there are a lot of

20  good people who appear in front of me having made terrible

21  mistakes or having run a business in a way that has gotten

22  them into a terrible problem.  I actually -- you can't do

23  this job and try to pass judgment on whether people are good

24  people or bad people, because nobody -- almost nobody -- I

25  shouldn't say -- falls easily in one of those kinds of

1    categories.  I don't doubt that there was some good at least

2    in terms of purpose.  And that this -- if I were to -- my

3    observation is that you were in way over your head and were

4    not capable of undertaking this from the get-go.  But that's

5    just my observation.

6         That doesn't excuse the conduct and it doesn't

7    explain it entirely.  It's just a serious case.  I mean,

8    these are our most vulnerable citizens.  I agree entirely

9    with Mr. Andre that the opportunity for fraud in these

10   systems is enormous.  Absolutely enormous.  It's like the

11   tax system.  And I feel strongly that there is an important

12   general deterrence, especially given the priorities that our

13   society has decided to place on trying to eliminate fraud in

14   the health care system.  It is crushing us and it hurts the

15   whole -- all people who need health care, which could be

16   potentially most of us.

17        So I've tried to balance this.  And I also believe

18   that there are other kinds -- and I think the evidence is

19   more than sufficient to show that the manual therapy wasn't

20   the only type of fraud that was being committed here.  She

21   could have goodness in her heart, so to speak, and this is

22   still a really quite extraordinary scheme to defraud

23   Medicare and to get payments for things that either weren't

24   delivered; or alternatively, weren't -- they couldn't be

25   delivered or the person was not even there.

1        So that I am going on the high end of the

2   guidelines in imposing 75 months on Count 1, 60 months on

3   Counts 2 through 35.  They run concurrent.  When you're

4   released -- I think actually you're going to be somebody who

5   will be able to do good while you're in the institution.

6            You're asking for Alderson?  Is that what --

7            MR. CHEN:  West Virginia, Your Honor.

8            THE COURT:  Alderson.  I'm happy to recommend it,

9   I must say.  If she had family in other parts of the

10  country, I guess that's as close -- I don't know where the

11  other female facility is.

12           I have ordered restitution at $3,168,559.29.  She

13  also owes a special assessment, given the number of counts

14  here, of $3,500.  The three-year supervised release on

15  Counts 1 through 35 will run concurrently.  We've indicated

16  where the restitution is to be paid.

17           When you get out, you're to report immediately to

18  the probation office.

19           While on supervised release, you are required both

20  to do community service at the rate of 150 hours per year.

21  I think you can help people to learn to read or to learn to

22  -- to tutor people in school.

23           You're not going to be allowed to get involved in

24  medical billing or medical care.  You can't provide medical

25  care or be involved in medical billing.

1          In addition, you're required under law to provide

2     a DNA sample.

3          I'm recommending to the Bureau of Prisons that

4     there be mental health evaluation and treatment.  As part of

5     supervised release, you will also participate in mental

6     health treatment as prescribed by probation.

7          You will be obligated to pay restitution at a rate

8     starting at -- I'm going to establish it at $50 a month.

9     And they'll raise it as soon as you have the means to pay

10    more.  These forfeiture orders and restitution will follow

11    you forever.  So should you ever obtain money, they are

12    entitled to get it.  But until you get employment of some

13    sort, the restitution amount will be set at $50 a month.

14         You will provide probation all financial documents

15    requested, a financial statement, including all your assets

16    and where they are.  You will provide your income tax

17    returns.  You will not incur new credit lines.  You will not

18    open any new credit.  You are not to make any major

19    purchases -- that means cars and houses or any kind of real

20    estate -- without the permission of probation.  Part of it

21    is I think your business skills are almost nonexistent.  And

22    you cannot go out and purchase anything after you get out

23    that is of a major sort beyond living necessities without

24    approval of probation.

25         And as I said, you're not to be involved in any

1   employment that involves providing medical services or

2   medical billing.

3          You do have a right to appeal.  14 days after

4   judgment is entered you must, if you want, notice your

5   appeal.  You will tell counsel -- your counsel here has more

6   than ably represented you from Day 1.  You have been very

7   fortunate to get the best of legal representation.  I am

8   sure that they will lodge the appeal, if you want them to.

9   But if you fail to do it, you'll lose your constitutional

10  right to appeal.

11          I've entered the forfeiture order.

12          Is there anything further at this time?

13          MR. ANDRE:  Yes, Your Honor.  On the request of

14  the finance litigation unit I've been asked to request that

15  restitution be due immediately.

16          THE COURT:  Okay, I understand.  But if it isn't

17  paid immediately, at least I should establish a minimum

18  order.

19          MR. ANDRE:  Yes.  That's correct.  Should be due

20  immediately.

21          THE COURT:  I think that's the law now.  Kelly?

22  I'm sorry.

23          (Off-the-record discussion with the clerk.)

24          THE COURT:  I've been corrected.  Restitution is

25  not 29 cents, it's 28 cents.  I stand corrected.

1          Thank you, Kelly.  Anything else?

2          PROBATION OFFICER KRAEMER-SOARES:  No, ma'am.

3          THE COURT:  All right.  Mr. Chen, for you or your

4     client at this time?  Should we step back?

5          MR. CHEN:  Just one moment, Your Honor.  If I can

6     consult with her.  She wanted to raise one issue and I want

7     to make sure that I understand it fully.

8          (Off-the-record discussion between the Defendant

9     and her attorney.)

10          THE COURT:  I should add for the record that

11     actually Mr. Chen raised the issue of 3553.  The Court has

12     considered these factors and what would be a sufficient

13     sentence, but not greater than necessary.  And I, as I've

14     indicated, put emphasis in this kind of case on general

15     deterrence as well as punishment.  So that I think those

16     factors justify a sentence at the high end of the

17     guidelines.

18          Is there something further for your client?

19          MR. CHEN:  Yes.  Just one small request in

20     addition to mental health counseling, Ms. Wheeler advises me

21     that while she was in prison she injured her joints -- her

22     wrists and her ankles.  And she wanted to make sure that

23     when she's assigned to a Bureau of Prisons facility that she

24     gets the appropriate medical treatment for that.

25          THE COURT:  They do -- there's -- required to do a

1    med evaluation, and they'll do that.

2              MR. CHEN:  I understand.

3              THE COURT:  So the Court will order a medical as

4    well as mental health evaluation.  But it isn't, obviously,

5    the ideal treatment centers.

6              Okay.  Thank you.  Anything further?

7              MR. ANDRE:  I apologize, Your Honor.  I should

8    have raised this.  I would ask that while the defendant is

9    incarcerated and while on supervised release, she is to have

10   no contact directly or indirectly with Dr. Hastings.

11             THE COURT:  Okay.  I think that's appropriate.  So

12   there will be a stay away order both direct and indirect,

13   meaning phone calls, letters, or direct communication.  That

14   will apply from henceforth.

15             MR. CHEN:  Your Honor, I'm going to object to

16   that.  I don't see any harm in writing letters.  I think

17   that's unnecessarily Draconian restriction on Ms. Wheeler's

18   rights to communicate with family and friends.

19             THE COURT:  I don't know that she has the right to

20   communicate with Dr. Hastings in the sense that you're

21   speaking about it.  I think that --

22             Is the Government asking this because of

23   Dr. Hastings?

24             MR. ANDRE:  Your Honor, I think that there's an

25   order in place in Maryland that the defendant can't contact

1    Dr. Hastings.  And we'll reinforce that as a condition while

2    she's in prison and also while she's on supervised release

3    that she is not to contact Dr. Hastings.

4         THE COURT:  Yes.  I think so.  I don't have any

5    objection.  I think it's merited here.  If there's one out

6    of the probate court in Maryland, she's already under that

7    order anyways.  But it may be that I have better enforcement

8    powers.

9         MR. CHEN:  That's fine, Your Honor.  But as part

10   of Ms. Wheeler's pre-trial release, I think the Court

11   acknowledged that if the probate court in Maryland were to

12   lift its order, this Court would not impose any independent

13   restrictions.  And I think what Mr. Andre is asking now is

14   that as part of her incarceration this Court would be

15   exercising its authority.  And I don't think that's

16   appropriate.

17        THE COURT:  Well, I think it is appropriate.  And

18   if they lift it out there for some reason -- but I can't

19   imagine they will, I mean I really can't -- then you can

20   always come back.  It's a condition of probation.  It's not

21   the -- wouldn't preclude it.  But I do think that it makes

22   sense.  And I don't know what their order specifically says,

23   but I think Dr. Hastings has unwittingly become embroiled in

24   this situation and probably has suffered about as much as

25   anybody.

1                    All right.  I will order it.  Both a condition of

2          probation and a condition of incarceration.

3                    Okay.  Thank you.

4                    (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

3

4

5

6                I, VICKI EASTVOLD, do hereby certify that the

7    above and foregoing, consisting of the preceding 72 pages,

8    constitutes a true and accurate transcript of my

9    stenographic notes and is a full, true and complete

10   transcript of the proceedings to the best of my ability.

11        Dated this 16th day of November, 2012.

12

13                                    _____s/Vicki Eastvold_____
                                      Official Court Reporter
14                                    United States Courthouse
                                      Room 6722
15                                    333 Constitution Avenue, NW
                                      Washington, DC   20001
16

17

18

19

20

21

22

23

24

25